**UNITED STATES of America,
Appellee,**

v.

**Vincent ALO, Defendant-Appellant.**

**No. 439, Docket 35579.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 11, 1971.

Decided Feb. 19, 1971.

H. Richard Uviller, New York City (Benno Schmidt, Jr. and Jay Goldberg, New York City, on the brief), for appellant.

Gary P. Naftalis, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., Ross Sandler, Shirah Neiman, John W. Nields, Jr., John H. Gross, Asst. U. S. Attys., S.D.N.Y.), for appellee.

Before WATERMAN, Senior Circuit Judge and FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Vincent Alo, appealing from his conviction under 18 U.S.C. § 1505 for obstructing the Securities and Exchange Commission's administration of the federal securities laws, asserts three primary grounds for reversal: that, although the government may have proved other crimes not charged, its evidence did not support a conviction under § 1505; that he was denied his constitutional right to a speedy trial; and that the indictment upon which he stood trial was unduly vague. We affirm.

I.

Alo's conviction was based on his testimony at an investigative proceeding conducted by the SEC on May 25–26, 1966. The object of the investigation was to determine the beneficial ownership of several large blocks of securities, valued at $7.6 million, which constituted approximately one-third of the total issued shares of Tel-A-Sign, Inc.[1] Appearing pursuant to a subpoena, Alo was questioned about a series of meetings which he had attended at the Warwick Hotel in New York in late 1964.

About one year prior to the meetings, a Miami Beach attorney, Alvin Malnik, organized Scopitone, Inc. to exploit in the United States a French variant on the familiar juke box: in addition to playing the chosen musical selection the Scopitone device showed a synchronized color film on a 26-inch screen. Ownership of Scopitone was evenly divided between Malnik and his associates and the "Uchitel group," which consisted of four business men from the New York area: Maurice Uchitel, a restaurant and real estate owner, Alfred Miniaci, Irving Kaye, and Abe Green, all involved in various aspects of the coin-operated machine industry.

On July 29, 1964, Malnik, using powers of attorney executed by the Scopitone shareholders, transferred an eighty percent interest in the corporation to Tel-A-Sign for stock then worth $3.5 million. Instead of dividing these proceeds between himself and the Uchitel group, Malnik retained approximately nine-tenths of the Tel-A-Sign stock. Beyond this lopsided distribution of the Tel-A-Sign shares, Malnik proposed to keep the remaining twenty percent interest in Scopitone. The members of the Uchitel group objected strenuously to Malnik's division of the sale proceeds, as might well have been expected. Green protested directly to Malnik, who told him to arrange a meeting of all members of the Uchitel group. The resulting conference, the first of two at the Warwick Hotel in the latter part of 1964, was attended by Green, Miniaci, and Kaye, representing the Uchitel interests, and by Alo, who represented Malnik. Alo expressed the hope that a settlement could be reached without re-

---

1. Tel-A-Sign's registration in late 1965 of some 90,000 unregistered shares in the name of certain selling shareholders was the immediate occasion of the investiga- tion. The Commission apparently had reason to believe that Alo and one Gerado Catena were the undisclosed beneficial owners of large blocks of Tel-A-Sign stock.

course to litigation, but insisted that Malnik had earned his lion's share of the proceeds by dint of his greater efforts in promoting the Scopitone venture. The Uchitel group insisted on a division according to the respective shares held in Scopitone, Inc. In Uchitel's absence, no agreement was reached.

The second conference at the Warwick was attended by Alo, Uchitel, Miniaci, and Kaye. Alo still pressed for a negotiated settlement but balked at the Uchitel group's insistence on thirty-five percent of the proceeds. A settlement was eventually reached in April 1965 when the Uchitel group agreed to accept approximately twenty-five percent. The SEC's investigation into these dealings began soon thereafter, when the Commission received information that Alo and Gerado Catena had been the real parties in interest in Scopitone, Inc. and that these two had thereby come into undisclosed beneficial ownership of large blocks of Tel-A-Sign stock.

At the SEC's investigative hearings some eighteen months after the Warwick Hotel meetings, Alo claimed to remember practically nothing about them beyond his own attendance at Malnik's request and the fact that they concerned a dispute over the distribution of Tel-A-Sign stock. He had no recollection of a corporation named Scopitone, Inc., or of how the Malnik-Uchitel dispute arose. He could not recall who arranged the meetings or how he learned when and where they would be held. As to what actually transpired at these meetings, Alo testified that he had forgotten all save that the Uchitel group was dissatisfied with its allocation of Tel-A-Sign stock and that he urged an amicable resolution of the dispute. Indeed, by the government's calculation Alo pleaded a memory lapse some 134 times in one and a half hour's testimony. The 1969 indictment on which Alo was tried charged that his answers were false and evasive, and that he intended thereby to frustrate the SEC's investigation.

## II.

■ Alo argues that a witness's evasive answers before an administrative agency do not "obstruct, or impede the due and proper administration of the law," 18 U.S.C. § 1505. He seeks to escape the plain meaning of the broad language of § 1505 by directing our attention to a characteristic common to all of the more specific subdivisions of § 1505. That is, each of these provisions relates to tampering with sources of evidence *extrinsic to the actor*, such as the intimidation of a witness or the falsification of documents.[2] Invoking the principle

2. 18 U.S.C. § 1505.

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before any department or agency of the United States, or in connection with any inquiry or investigation being had by either House, or any committee of either House, or any joint committee of the Congress; or

Whoever injures any party or witness in his person or property on account of his attending or having attended such proceeding, inquiry, or investigation, or on account of his testifying or having testified to any matter pending therein; or

Whoever, with intent to avoid, evade, prevent, or obstruct compliance in whole or in part with any civil investigative demand duly and properly made under the Antitrust Civil Process Act willfully removes from any place, conceals, destroys, mutilates, alters, or by other means falsifies any documentary material which is the subject of such demand; or

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of law under which such proceeding is being had before such department or agency of the United States, or the due and proper exercise of the power of inquiry under which such inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

of *ejusdem generis*, Alo argues that Congress must similarly have intended that the catchall language of § 1505 would not reach those who "obstruct * * * administration of the law" by suppressing their own knowledge of relevant facts.

So restrictive a gloss, however, would produce the anomalous result that concealing information recorded in one's papers would constitute, as the appellant concedes, an offense under § 1505, but concealing data recorded in one's memory would not. No rational basis for differentiating between these two types of evidence has been suggested to us, and without a clear statement of contrary Congressional intent we cannot attribute such an arbitrary distinction to the legislature. Like the specific provisions which precede it, § 1505 deals with the deliberate frustrations through the use of corrupt or false means of an agency's attempt to gather relevant evidence. The blatantly evasive witness achieves this effect as surely by erecting a screen of feigned forgetfulness as one who burns files or induces a potential witness to absent himself.

Alo objects that such an interpretation of § 1505 will open an avenue for wholesale evasion of the so-called "two-witness rule" to which perjury convictions must conform.[3] We disagree. It is true, that to convict Alo the jury had to conclude that he was lying when he professed loss of memory, but the gist of his offense was not the falsehood of his statements, but the deliberate concealment of his knowledge. The SEC was not interested in Alo's mnemonic powers, but in the details of the Warwick Hotel meetings. Alo's profession of forgetfulness was not so much false testimony as a refusal to testify at all.[4]

It is also argued that our reading of § 1505 will permit the government to circumvent the procedure set forth in § 21(c) of the Securities Exchange Act, 15 U.S.C. § 78u(c), whereby recalcitrant SEC witnesses may be taken before a federal court, advised of their duty to furnish evidence, and held in contempt if they persist in their refusal. But the same subsection provides a non-contempt misdemeanor penalty for unjustified refusal to obey an SEC subpoena, thereby negating any inference that Congress intended to make this contempt procedure the exclusive manner of dealing with stubborn witnesses.

Lastly, we must reject the suggestion that the § 21(c) misdemeanor provision itself preempts Alo's prosecution as a felon under § 1505 because it deals more specifically with the refusal of a subpoenaed party to give evidence to the SEC. Such a reading of § 1505 would produce the ironic result that an act otherwise a felony under § 1505, such as the deliberate destruction of important documents, would become a mere misdemeanor if in addition to obstructing the agency's administration of the laws, it was in defiance of that agency's subpoena.

### III.

Alo strongly urges that he was deprived of his sixth amendment right to a speedy trial. He claims that the 1969 indictment merely supplanted a substantially identical sealed indictment returned in 1966. Although the government has steadfastly refused to concede the existence of a 1966 indictment, neither has it denied Alo's contention.

3. See, e. g., Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945).

4. See United States v. Appel, 211 F. 495, 496 (S.D.N.Y.1913) (L. Hand, D. J.):
   If a court is to have any power at all to compel an answer, it must surely have power to compel an answer which is not given to fob off inquiry. Nevertheless, this power must not be used to punish perjury, and the only proper test is whether on its mere face, and without inquiry collaterally, the testimony is not a bona fide effort to answer the questions at all.
   Cf. United States v. Essex, 407 F.2d 214 (6th Cir. 1969) (interpreting 18 U.S. C. § 1503, judicial counterpart of § 1505, as not encompassing deliberate lying by witness where gist of offense was falsehood, not evasiveness, of testimony).

Both parties have argued the case on the assumption that such an indictment was returned, and we will do the same.

Assuming *arguendo* that there *was* a 1966 indictment, then, we agree with Alo's premise that a superseding indictment, filed for no apparent reason other than to update the earlier one, could not cure an otherwise intolerable delay between the original indictment and trial. The constitutional right to a prompt trial cannot be circumvented by such a simple expedient as reshuffling substantially identical documents.[5]

Viewing as critical the period after the filing of the 1966 indictment, we conclude that the government put off Alo's trial for approximately three years.[6] Moreover, it has offered no justification for its dalliance. And Alo's silence cannot be considered a waiver of his speedy trial right because he had no knowledge of the sealed 1966 indictment. We are nevertheless constrained to find no unconstitutional delay. As to one of the most crucial criteria for determining impermissible pretrial delay—prejudice to the defendant—Alo's case is fatally defective.[7] Because the 1966 indictment was secret, Alo suffered neither pretrial detention, nor personal anxiety and public obloquy, often the most obnoxious concomitants of an indictment. Moreover, the particular circumstances of the case made it clear that the delay did not hamper Alo's capacity to present his defense. His precise testimony before the Commission was a matter of public record, and the fading memory of witnesses to his answers could therefore not weaken his case. Alo argues, however, that if his trial had been held closer to the time of his SEC testimony, and the other participants in the Warwick Hotel meetings, if called as witnesses, had suffered a similar memory loss, this would have given greater force to his claim of bona fide forgetfulness. Whatever force this might have under other circumstances, here Alo's Warwick co-conferees could remember even at his 1970 trial such basic facts of the meetings as who arranged them, how the dispute arose, and what points of view were expressed.

■ In light of these circumstances, Alo's contention that we must "presume" prejudice in his case is tantamount to advocating the elimination of prejudice as a factor to consider. The sixth amendment speedy trial clause was designed to protect criminal defendants from unfair prejudice[8] rather than to set down a general rule of judicial administration, desirable as such a rule might be on policy grounds.[9] And since pretrial delay may benefit as well as prejudice a defendant, it is incumbent upon him to show that he has been adversely affected.[10] We have not been

5. The government's contention that the delay prior to the filing of the 1969 indictment should be considered pre-indictment delay is based upon the claim that Alo was not arrested until sometime thereafter. However, where an indictment, such as the 1966 indictment of Alo, precedes an arrest, the relevant period begins with the indictment rather than with the arrest, unless, of course, the defendant is a fugitive. See United States v. Simmons, 338 F.2d 804, 807 (2d Cir. 1964), cert. denied, 380 U.S. 983, 85 S.Ct. 1352, 14 L.Ed.2d 276 (1965).

6. Three years is the approximate period between the filing of the sealed indictment sometime in the latter half of 1966 and the filing of the second indictment in October 1969. The eleven-month delay from October 1969 to the beginning of Alo's trial in September 1970 was caused by changes in Alo's counsel, pretrial motions, and adjournments either consented to or requested by Alo.

7. See United States ex rel. Solomon v. Mancusi, 412 F.2d 88 (2d Cir.), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed. 2d 236 (1969).

8. United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

9. Cf. Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (promulgated Jan. 5, 1971, effective July 5, 1971) (dismissal of indictments without showing of prejudice).

10. In this respect the right to a speedy trial would appear distinct from the other rights secured by the sixth amendment. Cf. Dickey v. Florida, 398 U.S. 30, 54–56, 90 S.Ct. 1564, 26 L.Ed.2d 26 (Brennan, J., concurring).

cited to any decision holding that a Sixth Amendment violation had resulted, where the defendant failed not only in demonstrating actual prejudice in any respect, but also in establishing the credible *possibility* of prejudice.[11]

## IV.

■ Alo's alternative ground for dismissing the 1969 indictment requires less extended consideration. He claims that the indictment lacked the requisite specificity. In large part the indictment tracked the relevant portion of the statute, 18 U.S.C. § 1505, reciting that Alo did "unlawfully, wilfully, knowingly and corruptly obstruct and impede and endeavor to obstruct and impede the due administration of laws of the United States * * * under which a proceeding * * * before a department and agency of the United States * * * was then pending and being had * * *." These general allegations were fleshed out with the phrase "by giving false and evasive answers to questions put to him as a witness in such proceeding," and with the appropriate specifics as to date, statute, and names of the administrative agency and proceeding.

Alo's objection to the supposedly vague indictment is that it failed to apprise him of the "nature and cause of the accusation." [12] Considering the fact that Alo's forgetfulness was the constant theme of his testimony before the SEC, we have little doubt that, although somewhat greater specificity would have been advisable, he understood precisely what the phrase "false and evasive answers" referred to.

The last traces of any lingering doubts were clearly removed when upon Alo's request the government served him with two bills of particulars, the first consisting of a transcript of Alo's entire SEC testimony with each allegedly "false and evasive" answer marked as such. The second bill of particulars specified the manner in which these answers were false, *viz.*, that Alo in fact remembered the facts he claimed to have forgotten, and the manner in which they were evasive, namely that poor recollection was repeatedly invoked to avoid giving the SEC responsive answers.[13]

11. In particular, the opinions which speak of "presuming" prejudice uniformly reveal the substantial possibility of prejudice. See Taylor v. United States, 99 U.S.App. D.C. 183, 238 F.2d 259, 262 (1956) (two-year delay following indictment, of which defendant was not informed; loss of alibi witnesses to meet "weak" government case) ; United States v. Blanca Perez, 310 F.Supp. 550 (S.D.N.Y.1970) (six-year delay following public indictment; death or disappearance of 3 witnesses; emigration of 2 witnesses) ; United States v. Mann, 291 F.Supp. 268 (S.D.N.Y.1968) (9½-year delay following public indictment; death of 2 witnesses) ; In re Provoo, 17 F.R.D. 183 (D.Md.), aff'd per curiam, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955) (5-year delay following public indictment for capital crime; detention pending trial, with medically diagnosed deterioration in mental health; death or disappearance of "many" possible witnesses). In United States v. Lustman, 258 F.2d 475, 477 (2d Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed. 2d 109 (1958), although the court found that a convincing showing of prejudice in the preparation of his case had not been made, the defendant was subject to the ignominy and psychological burden of a public indictment pending for 4 years. In any case, *Lustman's* broad dictum that "a showing of prejudice is not required," *id.* at 478, has not been followed in subsequent decisions of this court. See United States ex rel. Solomon v. Mancusi, 412 F.2d 88, 90–91 (2d Cir.), cert. denied 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969).

12. U.S.Const. amend. VI.

13. The venerable principle that a bill of particulars cannot "give life to what was dead when it left the grand jury," Foster v. United States, 253 F. 481, 484 (9th Cir. 1918), does not mean that we must ignore the relief which a bill is designed to provide and which Alo received in this case. See also Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed. 2d 240 (1962) ; United States v. Lattimore, 94 U.S.App.D.C. 268, 215 F.2d 847, 850 (1954). That principle touches not on the defendant's notice of the case he

After a careful review of the entire record, we find Alo's further claims of prejudicial error to be without substance.

Affirmed.

will have to meet, but on his fifth amendment right to be proceeded against by grand jury indictment. Specificity in the indictment is a corollary of the grand jury right because a loosely phrased accusation would allow the prosecutor to proceed at trial on a theory which the grand jury had never considered. A bill of particulars obviously is no safeguard against such an evasion of the fifth amendment. But no such claim is raised in this case.