**UNITED STATES of America, Appellee,**

v.

**Aaron WATSON, Robert Whitley, and John Muse, Appellants.**

**Nos. 439, 491, 513, Docket 78–1296–98.**

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1979.

Decided April 30, 1979.

Harvey L. Greenberg, New York City, for appellant Whitley.

David J. Gottlieb, The Legal Aid Society, Federal Defender Services Unit, New York City, for appellant Muse.

Robert I. Weiswasser, Brooklyn, N. Y., for appellant Watson.

Harvey J. Golubock, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before FRIENDLY, SMITH and OAKES, Circuit Judges.

OAKES, Circuit Judge:

All three appellants claim violation of their speedy trial rights, restriction of the scope of their cross-examination of a key Government witness, and deprivation of a fair trial because of the dramatic behavior of the witness. They appeal from convictions after a jury trial before the United States District Court for the Eastern District of New York, Charles P. Sifton, Judge. The indictment was in one count charging a conspiracy between March and November of 1971 to distribute heroin and possess it with the intent to distribute it, in violation of 21 U.S.C. §§ 174, 812, 841(a)(1), and 846. Appellant Watson was sentenced to nine years' imprisonment and a ten-year special parole term, Whitley to six years' imprisonment and a six-year special parole term, and Muse to five years' imprisonment and a five-year special parole term. We affirm the convictions of appellants Watson and Whitley but reverse the conviction of appellant Muse with instructions to dismiss his indictment.

The Government's proof at trial traced the history of a narcotics "family" from 1966 through 1971. What started as the "Aiken organization" was taken over by Alvin Bynum. *See generally United States v. Bynum*, 485 F.2d 490, 94 S.Ct. 2598, 41 L.Ed.2d 209 (2d Cir. 1973), *vacated and remanded*, 417 U.S. 903 (1974). "Dickie" Diamond, a principal Government witness at appellants' trial, worked with both Aiken and Bynum and testified to pre-conspiracy heroin purchases by appellants Watson and Muse. MacArthur Egister, another Government witness, testified to pre-conspiracy deliveries of heroin to Muse for Diamond.

The conspiracy began after Diamond was arrested for murder and jailed in February 1971. According to Egister, Muse gave Egister money to obtain heroin from Bynum, and Bynum sent Egister to see "his man," appellant Watson, at the 432 Club on Nostrand Avenue in Brooklyn. Watson instructed Egister to pay appellant Whitley, who was at the bar, and Watson told Whitley to count the money which he did in the club's bathroom. Whitley asked Egister for the keys to his car, left the bar with them, returned shortly and told Egister that the car was "ready." Egister went out to his car where he found the package of heroin that he subsequently delivered to Muse. Several similar transactions took place in which Muse bought from Egister who in turn received the Bynum heroin from Watson and Whitley. Muse usually bought one-eighth of a kilogram for $4,500 and the sales took place two or three times a day several days each week. Egister's testimony was corroborated by Francis DiCarlo, Special Agent of the Drug Enforcement Administration. DiCarlo conducted surveillance of the 432 Club on numerous occasions; he observed Watson at the club on approximately ten of them and almost always observed Whitley at the club. Several times DiCarlo saw Egister and Whitley enter the club together; Whitley would exit the club alone, drive away and return in Egister's car, and reenter the club; and Egister would then leave the club in his car.

When Diamond was released on bail in May of 1971 he met with Watson and Bynum. Bynum told Diamond that Watson had become one of the former's chief lieutenants. Later, when Diamond attempted to obtain heroin from Bynum, Bynum sent him to Watson who supplied Diamond with it. Diamond also testified to a meeting among himself, Egister, Watson, and Muse which resulted in Muse's purchasing two-eighths of a kilogram for $9,000. Diamond testified to another transaction involving Watson and Whitley that occurred in the autumn of 1971 during a dock strike. And Egister testified that at the time of a Muhammad Ali fight shown at the Carroll Theater on Utica Avenue in Brooklyn on November 19, 1971, he complained to Bynum about the quality of the heroin that he was receiving; when Watson discovered the complaint, he told Egister that he could take or leave the heroin.

Watson's case included the testimony of three witnesses, one of whom said that she saw Watson working on Alvin Bynum's house, another of whom testified that Watson was the superintendent of a building at 959 Park Place and was a contractor (the testimony was offered to show that the "work" that Watson did for Bynum was related to contracting, not narcotics), and a third who said that she had been sexually molested by Diamond in 1970 and that Watson and Diamond had argued over the incident. Muse testified in his own behalf that, although he had distributed heroin for Diamond and Egister in 1969 and 1970, he stopped purchasing from them around Christmas of 1970, after an argument about synthetic heroin, and he purchased or transported no heroin whatsoever in 1971. Whitley did not testify and presented no witnesses.

I. *Speedy Trial Claim.*

Appellants argue that the preindictment and postindictment delays in this case violated their speedy trial rights—specifically,

their due process right not to be prejudiced by preindictment delay and the Sixth Amendment right to a speedy trial—and also argue that the statute of limitations itself was exceeded because the Government waited for an unreasonable length of time before unsealing the indictment. For the reasons that follow, we agree with appellant Muse that the delay here exceeded the period of limitations as to him and requires the dismissal of his indictment, but we are unpersuaded by the other objections.

The indictment in this case was returned on June 1, 1976, that is to say, it was "found" five months within the five-year period required under 18 U.S.C. § 3282,[1] for it charged Watson and Muse with conspiracy between March and November, 1971. It named two "John Doe" conspirators, one of whom was discovered to be Whitley only at a later date. The court ordered the indictment to be sealed on its return and issued bench warrants for the four alleged conspirators. The court unsealed the indictment in late September of 1977, when Watson and Muse were arrested—a date almost sixteen months after it had been returned and almost six years from the end of the alleged conspiracy. Whitley was not located or arrested until early December 1977. Trial took place in April 1978.

Appellants argue that the fifty-five-month period of time elapsing between November of 1971 and the filing of the indictment added together with the sixteen-month period during which the indictment was sealed violated their rights to a speedy trial.

■ We first address the complaint that the delay in filing the indictment violated appellants' due process rights. In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court emphasized that the statute of limitations should be the primary protection against preindictment delay. The Court did sug-

1. 18 U.S.C. § 3282 provides:

    Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless

the indictment is found or the information is instituted within five years next after such offense shall have been committed.

gest, however, that if a defendant showed "substantial prejudice" and that the Government intentionally delayed "to gain tactical advantage over the accused," due process might be violated. *Id.* at 324, 92 S.Ct. at 465. In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Court explained that a good faith investigative delay, even if it causes some prejudice, does not violate the Due Process Clause. Under these standards, appellants' argument must fail.

The Government's affidavits showed that Diamond did not begin his cooperation with the Government until 1974 during an investigation involving the Frank Matthews narcotics organization. It was as a result of the Matthews investigation and ensuing trial, which lasted from early August until October of 1975, that the Government developed information concerning Watson's narcotics activities. It was also not until the conclusion of the Matthews trial that the Assistant United States Attorney who had tried that case and who was handling the Watson investigation interviewed Egister. (The office of the United States Attorney had concluded that to place a different attorney in charge of the Watson investigation would be inefficient and, indeed, would cause delay.) Both Diamond and Egister testified about Watson and his associates before a grand jury in the Eastern District of New York in mid-March of 1976, and the Government was attempting to obtain additional corroborative witnesses until the indictment was handed down in June. The district court found that "on balance, considering the reasons for the delay, I find that there was a kind of [good] faith investigative justification for the delay in returning the indictment." In light of the circumstances just described, we cannot fault his finding. Accordingly, we hold that appellants have failed to prove a violation of their due process rights by any preindictment delay.

More troubling, however, is the additional sixteen-month delay between the sealing and unsealing of the indictment. The Government concedes that it was aware of the location of appellant Muse during a substantial portion of the sixteen months. But, it argues, because it did not wish to tip off the other defendants, the Government included Muse in the sealed indictment without seeking a separate indictment. Muse was not arrested until appellant Watson was arrested. With respect to Watson, although he was not arrested until September of 1977, the Government had attempted to locate him by use of confidential informants and surveillance both at his home and at other locations that he was known to frequent. The Government concedes knowledge of the location of this permanent address but notes that Watson had separated from his wife and lived at a different address for an unspecified period of time. There is no indication that the Government was aware that Watson had voluntarily reported to the New York police on another matter some six months before his arrest. Judge Sifton found no reason to doubt the good faith of the Government's effort to locate Watson and, in the light of the well-publicized flights of Frank Matthews and others wanted in connection with narcotics charges, found that it was realistic for the Government to believe that an arrest of one defendant would lead to the flight of one or more of the others. Indeed, the "John Doe" codefendant in this case known as "Youngblood" has not even now been located. As to the appellant Whitley, the other "John Doe" defendant, whom Egister and Diamond knew only as "Robert" or "Charles," the Government learned his real name only on December 19, 1977, when an informant identified him. He was arrested that same day.

■ Although the delay between filing and unsealing the indictment was not so clearly justifiable as the prefiling delay, we conclude that the Government's efforts to find the defendants during that period were nevertheless in good faith under the standard established by *Lovasco, supra.* Accordingly, we hold that the delay in unsealing the indictment did not violate appellants' due process rights.

We turn, therefore, to the statute of limitations issue. The law seems clear that the filing of a sealed indictment within the statutory period serves to toll the statute of limitations even if the indictment is not unsealed until after the period has expired. *United States v. Michael*, 180 F.2d 55, 56–57 (3d Cir. 1949), *cert. denied*, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950). *See* 1 C. Wright, *Federal Practice and Procedure* § 110, at 200–01 (1969). Under Rule 6(e) of the Federal Rules of Criminal Procedure,[2] an indictment may be kept secret until a defendant is in custody or has given bail, and in that case the clerk seals the indictment and its contents remain undisclosed except when necessary for the issuance and execution of a warrant or summons. Thus, where a defendant cannot be found, it is possible nevertheless to indict him within the period of the statute, seal the indictment, and then by virtue of the sealed indictment to arrest him when he is located.

There must be limits, however, on the Government's privilege to toll the statute of limitations by a sealed indictment. In this case, appellants argue that the Government acted unreasonably in waiting ten months beyond the limitations period before unsealing the indictment. Neither Whitley nor Watson were fugitives, the argument runs, and their whereabouts could have been determined, in Whitley's case if the Government had known his true name "Robert" or "Charles" and in Watson's case if it had searched a little harder. And, as noted above, the Government concededly knew where appellant Muse was and did not arrest him simply to avoid alerting the others.

We believe that when a sealed indictment has tolled the statute of limitations, the policy of repose underlying the statute demands that the Government unseal the indictment as soon as its legitimate need for delay has been satisfied. We need not pinpoint the time at which this will occur, for it will vary from case to case. At least when the defendant can show substantial actual prejudice, the Government must show that the delay is justified by a strong prosecutorial interest, not simply by a legitimate interest.

We base this standard in part on the language of 18 U.S.C. § 3282, which provides that an indictment must be found within five years of the offense "[e]xcept as otherwise expressly provided by law." This language is a clear warning that the exception created by Fed.R.Crim.P. 6(e) must be construed strictly. *See also Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). We also rely upon the established doctrine, reiterated in *Marion*, *supra*, 404 U.S. at 322 n. 14, 92 S.Ct. at 464 n. 14, that "criminal statutes of limitation are to be liberally interpreted in favor of repose." To be sure, one element of the limitations policy is the interest in encouraging prompt investigation of criminal cases, *see Toussie, supra*, and that interest would not be disserved even by a long delay after the indictment is sealed, for the sealed indictment must still be filed within the ordinary limitations period. But the most important limitations policy is insurance against the inevitable prejudice to the defendant occasioned by the delay. In particular, we have noted that the tolling of the statute of limitations by the filing of an indictment "is a sensible application of the policies underlying statutes of limitations" because "[t]he defendants are put on timely notice . . . that they will be called to account for their activities and should prepare a defense." *United States v. Grady*, 544 F.2d 598, 601 (2d Cir. 1976). *See ABA Project on Minimum Standards for Criminal Justice: Standards Relating to Speedy Trial* § 2.2(a), at 19 (Approved Draft, 1968). A *sealed* indictment, however, even if filed within the limitations period, may fail to offer this insurance.

---

2. Prior to amendment in 1977, Fed.R.Crim.P. 6(e) read in pertinent part:

The court may direct that an indictment shall be kept secret until the defendant is in custody or has given bail, and in that event the clerk shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons.

■ In light of this strong policy of notifying criminal defendants of the charges against them so that they may prepare a defense, the extension of the statutory limitations period implicitly permitted by Fed.R.Crim.P. 6(e) must be confined to reasonable limits. This standard permits an extension only to the degree necessary to accommodate the prosecutorial interests that the sealing of an indictment legitimately furthers.

This standard is also consistent with the two reported cases interpreting the limits of the Rule 6(e) extension of the limitations period, *United States v. Heckler*, 428 F.Supp. 269 (S.D.N.Y.1976), and *United States v. Sherwood*, 38 F.R.D. 14 (D.Conn. 1964). In *Sherwood*, the court dismissed an indictment that was filed just prior to the expiration of the statute and was only unsealed thirteen months later. Although the court based its holding on a finding of a violation of the speedy trial right under the Sixth Amendment and Fed.R.Crim.P. 48(b), the court also analyzed carefully the policies underlying Rule 6(e) and concluded that the sealing of an indictment "must be necessary, of reasonable duration under the circumstances, and exercised only to accomplish the limited purposes authorized by the criminal rule for which it was designed." *Id.* at 20. Applying this test, the court held that the indictment should have been unsealed no more than ninety days from the return date. Although two of the defendants were unavailable for the first two months of the period between the sealing and the unsealing of the indictment, the Government's only reason for keeping the indictment sealed during the remaining eleven months was to determine the validity of a third defendant's allegation that the Government had promised him immunity. That reason, the court implied, was not one of the authorized purposes of Rule 6(e).

In *Heckler, supra*, the court dismissed an indictment that was filed less than one month before the limitations period expired and was unsealed almost fourteen months later. Once again, the court's holding is premised not simply upon Rule 6(e) but also upon a constitutional provision, in this case the Due Process Clause. The court nonetheless stated: "When the defendants are available the government may not seal an indictment for more than a reasonable time after the statute of limitations has expired. A period of more than twelve months is not reasonable." 428 F.Supp. at 272. The court concluded that the delay was impermissible because the Government failed to show that an earlier unsealing of the indictment would have affected its other investigations and because defendants demonstrated substantial actual prejudice.[3]

■ Under the standard that we have outlined, we conclude that the statute of limitations is a bar to the prosecution of appellant Muse but not to the prosecution of the other appellants. The length of delay, almost sixteen months, is substantial, but the Government's legitimate need to locate the codefendants other than Muse is sufficient justification, absent proof of actual, substantial prejudice. Because the record reveals that Muse was prejudiced while Watson and Whitley were not, in our view the statute of limitations ran as to him.

Muse took the stand to testify, and it was critical to his defense that he as well as the Government witnesses be able to recall specific dates. A reading of his cross-examination indicates that he was harmed by his inability to remember dates and occurrences at the time of his withdrawal from the conspiracy. He could not remember the date that he changed apartments, the date

---

**3.** The court also suggested that a due process violation requires only a showing of substantial prejudice, regardless of whether the Government had intentionally delayed to gain a tactical advantage over the accused; and that in any case, the decision to seal the indictment was such an intentional, tactical act. *United States v. Heckler*, 428 F.Supp. 269, 273 (S.D.N. Y.1976). We are not convinced of the soundness of these suggestions in light of *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); our discussion of *Heckler* should therefore not be interpreted as an approval of its holding that the delay violated due process.

that he was arrested on federal narcotics charges, the people whom he was asked to identify upon arrest, or the car that he was driving in 1970. This contrasts with Watson and Whitley, who did not testify in their own defense, and they do not contend that they would have done so if the trial had occurred at an earlier date. Although much of the testimony of Government witnesses Diamond and Egister with respect to dates and times was not specific, it did describe a continuous series of transactions and was corroborated at least in part by Special Agent DiCarlo. In any case, appellants do not contend that the witnesses' memory lapses were so serious that the evidence was insufficient to support a verdict. At best they might contend that the

vagueness of the Government case prevented them from offering a strong and focused defense case. But this contention is also unpersuasive, for appellants were able to exploit the weaknesses in Diamond and Egister's testimony by cross-examination. There is no indication of other prejudice by way of lost witnesses, documents, or other evidence.[4]

■■■■ Watson and Whitley do have a Sixth Amendment argument. We conclude, however, that the speedy trial right under the Sixth Amendment attaches not when a sealed indictment is filed but when it is unsealed (or when the Government arrests the defendant or otherwise apprises him of the charges against him).[5] Thus the time

---

4. Judge Friendly disagrees on two grounds with our conclusion that the statute of limitations ran as to Muse. First, he suggests that Muse did not suffer substantial prejudice between June or November 1976 and September 1977. Even if we were to agree with the psychological premise on which this is based and of which we doubt judicial notice may be taken, we would not agree that only prejudice occurring within the period after indictment is relevant to Muse's statute of limitations argument. That would seem too technical a reading of the limitations policy. In effect we irrebuttably presume, in the ordinary case, that an indictment brought beyond the limitations period prejudices the defendant. In the extraordinary circumstance of an indictment filed within but unsealed after that period, our task is to give practical effect to the policy against prejudice. This certainly requires that we take account of the actual prejudice to the defendant, and the policy is disserved if we ignore preindictment (filing) prejudice. (Indeed, even if the defendant shows no prejudice, delay in unsealing the indictment would be unreasonable if there were no legitimate prosecutorial need for it.)

As to Judge Friendly's argument that even a superseding indictment against Muse might have tipped off Watson and Whitley, our opinion attempts to make the point that this "legitimate" government interest must be weighed against a defendant's showing of substantial prejudice.

5. We base our conclusion that Sixth Amendment speedy trial protections attach at the time a sealed indictment is unsealed instead of at the time it is filed upon the opinion in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In holding that the Sixth Amendment applies only to delay following indictment or arrest (whichever occurs first), the *Marion* Court reiterated the purposes of the

Sixth Amendment stated in *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), namely, to prevent oppressive incarceration, to minimize anxiety accompanying public accusation, and to limit the prejudicial effect of delay on the defense. *See also Barker v. Wingo,* 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We hold that the filing of a sealed indictment does not, in the light of these purposes, trigger the speedy trial provision. Because neither the indicted defendant nor the public has notice of the charges, such an indictment does not bring about "the major evils protected against by the speedy trial guarantee," *Marion, supra,* 404 U.S. at 320, 92 S.Ct. at 463, namely, public obloquy and anxiety to the accused. *See United States v. Hay,* 527 F.2d 990, 994 n. 4 (10th Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976). We conclude, in light of *Marion,* that a defendant's Sixth Amendment speedy trial rights attach only when a sealed indictment is unsealed (or when he is arrested). In order to challenge the delay between the sealing and unsealing of the indictment, the defendant must look either to the Due Process Clause or to the statute of limitations itself and whatever implicit restrictions that it imposes upon the Government's power to toll the limitations period by sealing the indictment.

*Marion's* observation that the statute of limitations is the principal constraint upon preindictment delay, 404 U.S. at 322–24, 92 S.Ct. 455, might appear to undermine our analysis. For the statute may *not* be an effective constraint if a sealed indictment can be unsealed at any time *after* the limitations period. Consequently, it could be argued, only the Sixth Amendment can effectively protect against the delay between the sealing and the unsealing of the indictment. *See Stewart v. State,* Ind.App.,

of delay for Sixth Amendment speedy trial purposes was, strictly speaking, only six months (the indictment was unsealed on September 30, 1977, and trial began on April 10, 1978). Although "preindictment" delay may have *some* relevance to the analysis of the speedy trial right, *see United States v. Vispi*, 545 F.2d 328, 333 (2d Cir. 1976), the six-month period is simply too short to raise a substantial Sixth Amendment issue under the balancing test of *Barker v. Wingo*, 407 U.S. 514, 530–31, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), especially in light of the speculative prejudice suffered by Watson and Whitley. Accordingly, we hold that the Sixth Amendment rights of Watson and Whitley were not violated.

## II. *Cross-Examination of Government Witness Diamond.*

Appellants argue that their right to cross-examine Diamond was impermissibly restricted, in violation of their Sixth Amendment right to confront the witnesses against them. When they sought to question Diamond about some of his recent activities, including his employment, whether he was supporting his family, and the price of his automobile, the court generally sustained the Government's objections to the questions. The Government told the court that Diamond was in its Witness Protection Program, that threats and attempts had been made on his life, and that disclosure of his occupation would jeopardize his life.

In cross-examining Diamond, counsel for appellants explored in extensive detail his criminal background: he had been a jewel thief and a fence for stolen negotiable instruments and stolen cars; he worked as a pimp who beat prostitutes; he had numerous previous narcotics dealings and convictions; he acted, after his first conviction, as both a Government informant and drug dealer; after Bynum's arrest he bribed a Drug Enforcement Agent to state falsely that Bynum was a Government informant, learned through this corrupt agent the identity of an informant on Bynum, and reported the name to Bynum, as a result of which the informant was killed; and he was convicted for murder in New Jersey in 1972 and subsequently pardoned (in the form of a reduced sentence) after he began furnishing information to the Government. We also note that following an in camera proceeding the court allowed Watson's counsel to cross-examine Diamond to show that he earned less than $6,000 in 1976 and filed no tax return for that year and earned $20,000 in 1977. Under all the circumstances, given the seriousness of the threat and the extensiveness of the cross-examination that the court did permit, we believe that the judge acted within his discretion in limiting the scope of cross-examination so as to permit Diamond to maintain his concealed identity. *See United States v. Cavallaro*, 553 F.2d 300, 304–05 (2d Cir. 1977); *United States v. Persico*, 425 F.2d 1375, 1383–84 (2d Cir.), *cert. denied*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); *United States v. Baker*, 419 F.2d 83, 87 (2d Cir. 1969), *cert. denied*, 397 U.S. 971, 90 S.Ct. 1086, 25 L.Ed.2d 265 (1970).

## III. *Diamond's Conduct as a Witness.*

The United States Attorney had alerted the court and other counsel that Diamond was fearful for his life because of appellant

354 N.E.2d 749, 753 (1976). This argument is not persuasive, however. First, the Due Process Clause remains a protection during this period, *Marion, supra*, 404 U.S. at 324, 92 S.Ct. 455, at least where there is substantial prejudice and delay was an intentional device for prosecutorial advantage. Moreover, as we point out in our opinion above, a sealed indictment may toll the limitation period only to the extent that its unsealing is not unreasonably delayed, at least where prejudice ensues.

To be sure, *United States v. Alo*, 439 F.2d 751, 755 n. 5 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971), held that the Sixth Amendment speedy trial right applied when an indictment was filed and not when the defendant was arrested. But although the indictment in *Alo* was sealed, the court did not specifically address the argument that a sealed indictment should be evaluated differently from an unsealed indictment. We also note that *Alo* was decided before *Marion, supra*, the case which first explained the significance of "indictment" for the speedy trial right.

Watson. When Watson's counsel attempted to question him regarding his earnings, the rent he paid, and whether he was supporting his wife and children, except as above stated the court ruled out the questions. Counsel inquired, however, as to the amount he had paid for his car. Diamond thereupon stated: "I won't—hey man, I ain't answering anything else. I am not going to put my life in jeopardy for anything." He then stalked out of the courtroom. The court excused the jury and appellants moved for a mistrial.

■ The court denied the motion, in part because Diamond had not indicated that his fear for his life was directed toward the defendants. The court also noted that Government counsel had earlier alluded to Diamond's involvement in the Witness Protection Program, without objection by appellants, and that Diamond had testified as to a murder conviction; thus the court concluded that "it is somewhat less likely in this case that the jury would assume, despite instructions to the contrary, that the threat to [Diamond's] life would stem from these defendants." When the jury returned the court gave a special curative instruction, to which none of the defendants objected, that Diamond's comments had nothing to do with the defendants or the case on trial. The instruction is set out in the margin.[6] When the Government suggested in its summation that Diamond had left the stand because he did not want anybody to find out where he was living, the court again quickly gave a curative instruction to the effect that this was not an issue with which the jury should concern itself and that the jury should draw no inferences concerning these defendants.

We think that the denial of the initial and renewed motions for a mistrial was under all the circumstances within the court's sound discretion. *See United States v. Kompinski*, 373 F.2d 429, 432 (2d Cir. 1967).

Judgment affirmed as to appellants Watson and Whitley; judgment reversed and indictment dismissed as to appellant Muse.

FRIENDLY, Circuit Judge, concurring and dissenting:

With respect to the affirmance of Watson's and Whitley's convictions, I concur in the result. With respect to the reversal of Muse's conviction, I dissent.

Judge Oakes finds that Muse suffered "substantial actual prejudice" from the delay in unsealing the indictment and concludes that therefore the Government must show not merely a "legitimate" but a "strong" prosecutorial interest in not having obtained a superseding indictment within the period of limitations that would have led to Muse's arrest, which it has not done. Along with the district judge, I see nothing to prove that Muse suffered substantial prejudice and believe that the Government showed whatever interest, "strong" or otherwise, is needed to justify its having proceeded as it did.

The supposed prejudice arises from the fact that, although in his direct testimony, given in April 1978, Muse had a vivid recollection that he had stopped distributing heroin for Diamond and Egister around Christmas of 1970, a date conveniently tailored to his claim that the statute of limitations had run before the indictment on June 1, 1976, on cross-examination he professed inability to remember a number of facts, some of which were more recent and several of

---

**6.** The Court: All right. Ladies and gentlemen, before Mr. Weiswasser [Watson's counsel] continues, before you broke, the witness expressed a concern for his personal safety. Now, as I instructed then, I instruct you now, that has nothing to do with the case which is on trial, the charge which is made against these defendants. As you probably realize from the testimony which you have heard, both this witness—or this witness has in the course of his cooperation for the—with the Government over a period of time, subjected himself to the

possibility of risk of his personal safety from a large number of sources. And it is certainly no charge and has nothing to do with this case. The charge in this case has to do with a conspiracy involving narcotics in 1971. You are to draw absolutely no inference and use in no way in your deliberations or in your own mind the concern which this witness has expressed, which is a concern having nothing to do with these defendants.

Transcript on appeal at 632–33.

which were subject to verification. Even if we make the charitable assumption that Muse in fact suffered a memory lapse on these items, there is nothing to show it had not occurred before June 1, 1976, when the indictment, conceded by the majority to have been timely, was returned, or November, 1976, when the statute of limitations ran. The notion that Muse's lapse of memory about where he lived between 1969 and 1970 occurred in the interval between June, 1976 or November, 1976 and September, 1977 defies the teachings of psychology,[1] as well as common sense. The conclusion of "substantial actual prejudice" is thus an unfounded conjecture; the case differs markedly from one where it can be shown that witnesses have died or disappeared or records have been lost at identifiable dates.[2]

I am even more baffled by the majority's conclusion of lack of "a strong prosecutorial interest." Surely my brothers are not suggesting that the Government did not have such an interest in apprehending Watson and Whitley, members of the Bynum narcotics organization, which, in addition to numerous offenses against the narcotics laws, had engaged in "one unsuccessful robbery, together with the near fatal shooting of the victim, another aborted robbery, and an elaborate plan to murder a corrupt New York City patrolman, who was thought to be cooperating with the authorities," *United States v. Bynum*, 485 F.2d 490, 493 (2 Cir. 1973), vacated, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), conformed to, 386 F.Supp. 449 (S.D.N.Y.1974), aff'd, 513 F.Supp. 533 (2 Cir.), *cert. denied*, 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975). What the majority is really doing, under the cloak of this form of words, is substituting its judgment that a superseding indictment before November, 1976 naming only Muse, or Muse plus Doe and Roe, and Muse's arrest pursuant thereto would not have involved serious risk of tipping off Whitley and Watson, in place of the prosecutors' judgment that it would. Muse's argument that there was no likelihood that he would have informed Watson and Whitley of his arrest, even if one were to accept it, misses the point, namely, the risk that Watson and Whitley, who were well aware of their traffic with Muse, would have learned of his arrest from other sources. I am not sufficiently experienced in the ways of the big-time narcotics underworld to be certain that this risk was insignificant; the narcotics cases I have observed over the past twenty years would lead me to the opposite conclusion. More important, the question is not what we think but what the prosecutors reasonably could have thought. Judge Sifton found that the delay in unsealing the indictment was the result of a "good faith . . . effort to find" Whitley and Watson; that a premature arrest of Muse might have made it impossible to locate them; and that none, including Muse, were prejudiced by the delay. We should give these findings of the trial judge, who saw and heard Muse testify and also observed the jury, the respect they deserve. While there must indeed be some limit on the time during which an indictment can be kept sealed as against a defendant who is not

1. The basic work on memory is Ebbinghaus, Uber das Gedachtniss (1885). He shows memory declining along an asymptotic curve, with most loss occurring within a few days and almost no further decline in the time span here at issue. The theory and data behind the Ebbinghaus curve have been refined but not significantly changed. See, e. g., Hutchins & Schlesinger, Some Observations on the Law of Evidence—Memory, 41 Harv.L.Rev. 860, 862 (1928); W. & H. Mischel, Essentials of Psychology, 68–70 (1977).

2. The majority, fn. 4, attempts to bootstrap its position with respect to prejudice by adding some or all of the period of pre-indictment delay, saying that "in effect" there is an irrebuttable presumption that "an indictment brought beyond the limitations period prejudices the defendant." Of course there is no such presumption; the statute of limitations sets an arbitrary period for the beginning of a prosecution for a wide variety of reasons. What is true is that there is a strong presumption that pre-limitation delay is not prejudicial, see *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). It would be incomprehensible, as a factual matter, that a strong presumption of no prejudice should change into an irrebuttable presumption of prejudice on a particular day.

concealing himself, that limit was not exceeded here.

I would affirm all the convictions.