**UNITED STATES of America,**

v.

**Louis CHERICO, Defendants.**

**No. 08 Cr. 786 (CM).**

United States District Court,
S.D. New York.

Feb. 25, 2011.

562

Jonathan Brian New, U.S. Attorney's Office, New York, NY, Nicholas Lloyd McQuaid, U.S. Attorney's Office, White Plains, NY, for Plaintiff.

Patrick Thomas Burke, Burke, Miele & Golden, LLP, Suffern, NY, Susan C. Wolfe, Hoffman & Pollok LLP, New York, NY, for Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTIONS TO DISMISS

McMAHON, District Judge:

Louis Cherico was indicted on August 20, 2008. The indictment was sealed by a United States Magistrate Judge on the day it was handed up by the grand jury. It was not unsealed and assigned to a judge until February 16, 2010. By that time, one witness to the transactions at issue had died and another had moved out of the country.

Cherico has filed a motion asking the Court to dismiss Counts Seven through Nine of the Indictment, on the ground that he was not charged within the five years statute of limitations applicable to those counts. He argues that it was not appropriate for the indictment to be sealed, in the first place, and since the date when it was unsealed (February 16, 2010) is beyond the five-year limitations period appli-

cable to those Counts, they cannot be prosecuted.

Cherico also moves for dismissal of the indictment in its entirety, on the ground that the delay resulting from the sealing of the Indictment violated his Sixth Amendment right to a speedy trial.

For the reasons set forth below, defendant's motion is denied.

*The Indictment*

Counts 1 through 6 of the Indictment charges Cherico with participating in a conspiracy to commit bank fraud from in or about July 2002 through in or about the end of 2002. The purpose of the bank fraud conspiracy was to purchase and refinance several multi-million dollar residential properties with mortgage and home equity loans obtained through the submission of false and misleading information to banks and other lenders. According to the Indictment, Cherico served as the attorney for various third parties who were co-conspirators in the scheme. In that role, he negotiated and closed fraudulent purchases and sales, allegedly as part of the scheme.

In furtherance of the scheme, Cherico and his co-conspirators, among other things, submitted banks loan applications and contracts of sale that reflected artificially high sales prices for particular properties, obtained loans by falsifying material personal and financial information about the borrowers, and falsely represented to various banks that a borrower had equity in a particular property, when in fact, the borrower had purchased the property with one hundred percent financing. Through these illegal activities, the co-conspirators allegedly bought properties they otherwise would not have been able to purchase: 28 Brae Burn Drive, Purchase, New York ("28 Brae Burn"), 116 Lakeshore Drive, Eastchester, New York ("116 Lakeshore Drive"), 4 Ridgeland Manor, Rye, New York ("4 Ridgeland"), and 3747 Purchase Street, Purchase, New York ("3747 Purchase"). Not only did the participants in the conspiracy obtain the money to purchase these properties under false pretenses; they allegedly earned millions of dollars in fees and commissions as well.

The statute of limitations on these charges is 10 years. *See* 18 U.S.C. § 3293.

Counts 7, 8 and 9 charge Cherico with conspiring to obstruct justice, obstructing justice, and money laundering. According to the Indictment, Cherico helped Dominick DeVito conceal his profit from the sale of 3747 Purchase Street from the United States Probation Office, which was preparing a report to be used in connection with DeVito's sentencing in a separate federal case. *United States v. Pasquale Parello, et al.,* 01 Cr. 1120(RLC). On August 22, 2003, DeVito submitted an affidavit describing his net worth to the United States Probation Office. In that affidavit, DeVito declared that he earned no income from the sale of 3747 Purchase Street. In fact, nearly $700,000 in profit from the sale of 3747 Purchase Street was deposited into the PREG account, which was controlled by DeVito. (Cherico Indictment at 1–12.)

The statute of limitation on these charges is 5 years. See 18 U.S.C. § 3282. The last activity alleged in furtherance of the purported obstruction of justice conspiracy in Count 7 occurred on August 22, 2003 (*Indictment* at 11 ¶ 18(d)). Count 8 alleges that Cherico obstructed justice through September 2003 (Indictment at 19), and Count 9 alleges that the purported money laundering scheme ended sometime in December 2003 (Indictment at 20). Thus, the Indictment was timely, with respect to these charges, when "filed" on August 20, 2008.

*The Indictment is Sealed*

According to the Government, the Indictment was the culmination of an extensive grand jury investigation into a course

of fraudulent conduct allegedly perpetrated by Cherico and his co-conspirators. The investigation resulted in a series of indictments.

On November 27, 2006, a grand jury in the Southern District of New York returned an indictment, 06 Cr. 1089(BSJ), charging Louis Cordasco, Jr. and John Liscio with a single count of conspiracy to commit mail fraud, in connection with a scheme where they filed inflated insurance claims for, among other properties, a house in Westchester.

On August 9, 2007, a grand jury returned a superseding two-count indictment, S106 Cr. 1089(BSJ) (the "S1 Cordasco Indictment"), charging Cordasco, Liscio, and Robert DiDonato with conspiracy to commit mail fraud and mail fraud in connection with the same insurance fraud scheme. The S1 Cordasco Indictment specified several properties in Westchester that were utilized in the scheme, including 28 Brae Burn Drive.

On October 2, 2007, a grand jury returned a second superseding indictment, S2 06 Cr. 1089(BSJ) (the "S2 Cordasco Indictment"). The S2 Cordasco Indictment added Dominick DeVito as a defendant, and charged DeVito with participating in the insurance fraud scheme charged in the S1 Cordasco Indictment.

On November 29, 2007, a grand jury returned a three-count, third superseding indictment, (the "S3 Cordasco Indictment"), which for the first time, charged Cordasco, Liscio, DiDonato, DeVito, and a fifth defendant, Daniel Forbes, with a conspiracy to commit bank fraud in connection with a scheme to purchase and re-finance multi-million dollar residential properties using mortgage and home equity loans obtained through the submission of false and misleading information to banks and other lenders. The S3 Cordasco Indictment also charged Cordasco, Liscio, DiDonato, and DeVito with the conspiracy to commit mail fraud in connection with the insurance fraud scheme that was charged in the previous Cordasco Indictments.

On April 29, 2008, a grand jury returned a fourth superseding indictment, S4 06 Cr. 1089(BSJ), which added additional properties to the bank fraud conspiracy. Daniel Forbes was not charged in the fourth superseding indictment; he died in January 2009.

Finally, on or about August 20, 2008, a grand jury returned the Cherico Indictment. According to the Government, two critical developments led the Government to seek an indictment charging Cherico with having participated in the mortgage fraud scheme described in the Cordasco Indictments.

First, in or about 2008, Forbes—who had proffered less than truthfully on several occasions—finally began to provide complete and truthful information about his role in the mortgage fraud. During his proffer sessions, Forbes told the Government that Cherico had played a prominent role in the mortgage fraud scheme. Based on Forbes' statements, the Government anticipated that Forbes would enter into a cooperation agreement with the Government and would testify for the Government against Cherico at trial.

Second, between December 2007 and July 2008, a potential cooperating witness (CW) recorded several telephone conversations and in-person meetings with Cherico. During those conversations, Cherico made admissions about his participation in DeVito's mortgage fraud scheme.

The same day the Cherico Indictment was returned, the Government submitted a four-page sealed *ex parte* letter to United States Magistrate Judge Michael H. Dolinger ("Sealing Letter"). In the Sealing Letter, the Government asked that the Cherico Indictment be sealed, thereby toll-

ing the statute of limitations. According to the Sealing Letter:

- Several of Cherico's current and former clients are known members of the Genovese Organized Crime Family, including Dominick DeVito.

- During an investigation into DeVito, the Government had begun to meet with, and debrief, the CW, who was close friends with Cherico. The CW had consensually recorded approximately six conversations with Cherico, in which Cherico made admissions about his participation in DeVito's mortgage fraud scheme.

- The CW was being used in a separate investigation, the target of which was a close associate of a high-ranking member of the Genovese Organized Crime Family. The investigation was focused on various racketeering acts committed by that person and other members of the Genovese Organized Crime Family, including the murder of a Genovese capo in Springfield, MA (the "Springfield murder"). The CW was proactively cooperating with the Government by making consensual recordings related to the Springfield murder and other racketeering acts, including gambling and loansharking.

- The Government expected to continue to utilize the CW for the purpose of gathering additional evidence of the Springfield murder and other crimes.

- If the Cherico Indictment were unsealed, the Government would be obligated to give the defense the consensual recordings of Cherico made by the CW. Turning over the recordings would reveal the CW's cooperation with the Government, which would shut down the Government's proactive investigation of the Springfield murder and related offenses and would place the CW's life in danger.

- The Government expected the Cherico Indictment to remain sealed for at least six months, but promised to unseal the indictment as soon as the CW's cooperation concluded.

Magistrate Judge Dolinger so ordered the Sealing Letter the same day, thereby sealing the Indictment.

The Government represents that, between in or about 2007 and January 2010, the CW described in the Sealing Letter provided information and cooperated actively with the Government in connection with an investigation into members and associates of the Genovese Organized Crime Family, including Arthur Nigro, involving various racketeering acts, including the Springfield murder. Among other things, the CW (1) made consensual recordings related to the Springfield murder and other racketeering acts, including gambling and loansharking; (2) picked up money related to illegal gambling activity; and (3) made consensual recordings with a member of the Genovese Organized Crime Family who was incarcerated.

In or about October 2008, the CW was temporarily disabled by a medical condition and consequently reduced his level of active cooperation for several months. After several months, when his health improved, the CW was able to return to his prior level of active cooperation, which included making additional recordings in the Nigro investigation.

In or about Fall 2009, the FBI began planning for the CW to end his active cooperation, enter a guilty plea, and be moved to a secure location. The Government's decision to have the CW plead guilty was based in part on the possibility that the CW would testify in a trial involving charges related to the Springfield murder that was scheduled to begin in March 2010 in the District of Massachusetts.

On or about December 29, 2009, the CW pled guilty in the Southern District of New York in a sealed proceeding, pursuant to a

cooperation agreement. On or about January 15, 2010, the CW was moved to a secure location.

On or about February 11, 2010, a grand jury returned a sealed, superseding indictment, S1 09 Cr. 1239(PKC), charging Arthur Nigro, and five other defendants, with racketeering crimes including the Springfield Murder (the "Nigro Indictment"). The Nigro Indictment was based in part on information provided by the CW and evidence gathered by the CW during his active cooperation. (Government Brief at 5–11.)

*The Indictment is Unsealed; Proceedings Before this Court*

Five days later, on February 16, 2010, the Cherico Indictment was unsealed and assigned to the Court. Cherico was arraigned on the Indictment on February 17, 2010 and was released the same day on a $500,000 personal recognizance bond, secured by $100,000 cash or property and co-signed by three financial responsible parties, and standard travel restrictions.

An initial pretrial conference was held on February 24, 2010 and a second conference date was set for May 7, 2010, in order to allow the defendant to review the voluminous discovery. The Court excluded time under the Speedy Trial Act until May 7, 2010, without objection from the defendant.

Between February 24, 2010 and May 7, 2010 the Government produced thousands of pages of discovery and eleven compact discs containing consensual recordings made by the CW of meetings and telephone calls with Cherico and others.

A subsequent conference was held on May 7, 2010. At that conference, the defendant asked for additional time to review the discovery and the Court excluded time under the Speedy Trial Act until July 6, 2010, without objection from the defendant.

On July 6, 2010, a third conference was held and a schedule was set for pretrial motions: Defense motions were scheduled to be filed on or about September 3, 2010. At the conference, the Court excluded time under the Speedy Trial Act until November 22, 2010, again without objection from defense counsel.

On or about October 22, 2010, the defendant filed the instant motion. On or about November 15, 2010, the Government submitted a letter, with the consent of defense counsel, asking for a revised briefing schedule and an adjournment of the scheduled conference date until January 25, 2011. The Government also requested, with the consent of defense counsel, the exclusion of time under the Speedy Trial Act, until January 25, 2011. On or about November 23, 2010, the Court so ordered the Government's requested briefing schedule and entered an order excluding time under the Speedy Trial Act through January 25, 2011. The instant motion was finally fully briefed and submitted for decision on January 20, 2011.

The parties again contacted the Court and asked to adjourn a conference scheduled for January 25 conference until February 24. The Court granted the motion, adjourning the matter to February 24, and excluding time under the Speedy Trial Act through February 24, 2011.

*Statute of Limitations*

■ Defendant moves to dismiss the two obstruction of justice charges (Counts Seven and Eight) and the money laundering charge (Count Nine) on the ground that the Cherico Indictment was not properly sealed and therefore not found within the five-year limitations period applicable to those charges.

The requirement that an indictment be brought within the applicable statute of limitations is "designed to protect individuals from having to defend themselves

against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970).

■■■ Section 3282 of Title 18, United States Code, states that "except as otherwise expressly provided by law" an indictment in non-capital cases must be found "within five years ... after such offense shall have been committed." 18 U.S.C. § 3282. An indictment is "found" within the meaning of Section 3282 when it has been returned by the grand jury and filed. *United States v. Srulowitz,* 819 F.2d 37, 40 (2d Cir.1987). "Once an indictment is brought, the statute of limitations is tolled as to the charges contained in that indictment." *United States v. Ben Zvi,* 242 F.3d 89, 98 (2d Cir.2001) (internal quotation marks and citation omitted).

■■■ A federal magistrate judge may "direct that the indictment be kept secret until the defendant is in custody or has been released pending trial." Fed. R.Crim.P. 6(e)(4). The Second Circuit has held that "there are various legitimate prosecutorial objectives, including, but not limited to, the facilitation of arrest, that will justify the sealing of an indictment." *United States v. Srulowitz,* 819 F.2d 37, 40 (2d Cir.1987). The decision of a Magistrate Judge to seal an indictment is entitled to considerable deference. *Id.* at 41; *United States v. Gigante,* 436 F.Supp.2d 647, 654 (S.D.N.Y.2006). "Sealing ... is but a ministerial act and it is wholly within the discretion of the Magistrate ... great deference is to be accorded to the discretion of the Magistrate in the exercise of that authority." *Srulowitz,* 819 F.2d at 41. Moreover, given the discretion given to the Magistrate to seal indictments, the "Government should be able, except in the most extraordinary cases, to rely on [the Magis-

trate Judge's decision to seal the indictment] rather than risk dismissal of an indictment, the sealing of which it might have been willing to forego." *United States v. Southland Corp.,* 760 F.2d 1366, 1379–80 (2d Cir.1985) (Friendly, J.). Even where an indictment is properly sealed, the Government must unseal the indictment "as soon as its legitimate need for delay has been satisfied." *United States v. Watson,* 599 F.2d 1149, 1154 (2d Cir.1979). When a defendant challenges the decision to seal an indictment, the burden is on the Government to establish reasons for sealing the indictment. *Srulowitz,* 819 F.2d at 41.

■■ A sealed indictment is "found" under Section 3282 when it is returned by the Grand Jury, even though the defendant has no notice of it, unless the defendant can show actual prejudice that arose between the time an indictment was sealed and the date of its unsealing. *United States v. Muse,* 633 F.2d 1041 (2d Cir. 1980) (en banc). Thus, an indictment timely filed and properly sealed is considered returned (or "found") when the indictment is sealed—even if the indictment is not unsealed until the limitations period has expired. *See United States v. Deglomini,* 111 F.Supp.2d 198, 200 (E.D.N.Y.2000).

Cherico argues that Magistrate Judge Dolinger sealed the indictment in error, because the stated purpose for the sealing-protecting an ongoing investigation *in an unrelated case*—is not a permissible basis for sealing an indictment. (Cherico Mem. at 5) (emphasis added). It is Cherico's position that "the Government's use of a confidential informant from another unrelated case to record conversations with him 'is a pale excuse to seal the indictment.' "

It does not save the day here for the government to argue that it needed to seal the indictment against Louis Cheri-

co to protect a confidential witness from disclosure when ... that witness adds nothing or very little to the case against Louis Cherico and is only significant in another unrelated more serious matter. That is Louis E. Cherico's central argument on this point.

(Cherico Memo at 2–3; Cherico Reply at 2).

Defendant concedes that the protection of an ongoing criminal investigation involving confidential source falls within the range of "legitimate prosecutorial objectives" that will justify the sealing of an indictment. *See Srulowitz*, 819 F.2d at 40. Indeed, in *United States v. Wright*, an indictment containing charges relating to the activities of a member of motorcycle gang was kept under seal for eighteen months because unsealing the indictment would have revealed the identity of an active confidential source and jeopardize both the safety of the source and an ongoing investigation. *See United States v. Wright*, 343 F.3d 849, 856–858 (6th Cir. 2003). The Sixth Circuit concluded that the "protection of [the confidential source] and the need to avoid compromising an ongoing investigation falls within the range of permissible reasons for sealing an indictment." *Id.* at 858.

Defendant argues that *Wright* is inapplicable because the investigation in that case was related to the case in which the indictment was sealed. Here, there is no connection between the Government's allegations against Cherico and the Massachusetts investigation that was the reason for sealing the instant indictment. Defendant suggests that, "the best way for the government to have concealed the identity of its informant here would be for it not to have used him in this case."

The Court rejects Cherico's suggestion that the Government was required to forgo the use of its confidential witness in this case if it wanted to keep the witness's identity secret while the witness completed his cooperation in the Massachusetts case. The CW had recorded conversations with Cherico—his close friend—in which Cherico allegedly made admissions about his participation in the mortgage fraud scheme. While defendant minimizes the value the CW's testimony adds to the Government's case, the Government has a right to present its case as it sees fit. *Cf. Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). Furthermore, the court fails to see how a witness who taped the defendant making admissions against interest could possibly be characterized as of minimal value.

Magistrate Judge Dolinger was fully aware of the reason why the Government sought to seal the indictment against Cherico; he knew that the Government wanted to keep the CW's identity secret in order to assist an ongoing investigation that had no relationship to Cherico. Nonetheless, he concluded that sealing the indictment for that purpose was proper. This Court must afford Magistrate Judge Dolinger's decision to seal great deference. *See Srulowitz*, 819 F.2d at 40. That is easily done, since I cannot see anything improper about the Government's request. The fact that the Massachusetts investigation did not involve Cherico is simply not a difference that makes a difference to the legitimacy of the Government's interest in protecting the CW from disclosure.

This case is distinguishable from *United States v. Gigante*, 436 F.Supp.2d 647, 660 (S.D.N.Y.2006), where Judge Chin held that the Government failed to establish a proper purpose for sealing several indictments over a period of nearly two years. The indictment were sealed so that the Government could continue its investigation into Gigante's activities. Distinguishing *Wright*, Judge Chin noted that the indictment had been sealed in *Wright* be-

cause the "Government demonstrated that secrecy [wa]s necessary to protect a confidential informant," *Id.* at 659 (citing *Wright,* 343 F.3d at 858). No such showing was made in *Gigante.*

In addition, in *Gigante,* the Government did not inform any of the Magistrate Judges who sealed the indictments in question that the Government sought sealing simply to toll the statute of limitations while the investigation continued, *id.* at 652, so no Magistrate Judge had the opportunity to decide at the time of sealing whether that constituted a legitimate prosecutorial purpose. *Id.* at 660. Here, the Government set forth a legitimate prosecutorial reason for sealing (protecting the identity of a witness)—a reason that was specifically recognized as legitimate in *Gigante, id.* at 659—and a Magistrate Judge had the chance to evaluate the Government's articulated reason and to pass on it before he ordered the indictment sealed.

■ The defendant also contends that the period of time the indictment remained sealed (nineteen months) was unreasonable. Where an indictment is properly sealed, the Government is obligated to unseal the indictment "as soon as its legitimate need for delay has been satisfied." *Watson,* 599 F.2d at 1154. Here the Government fulfilled that obligation. The Government continued to rely on the CW's active cooperation into 2010. It took steps before the end of 2009 to secure his safety and it unsealed the indictment in this case as soon as the indictment in the Massachusetts murder case was handed down. Only six weeks passed from the time the CW pled guilty, and four week from the time he was relocated, until the Cherico indictment was unsealed. The sealing period cannot possibly be deemed unreasonable.

Because the sealing of the Indictment was proper and the Government complied with its obligation to unseal the Indictment as soon as its need for delay was satisfied, the Indictment is deemed returned on the day it was handed down—August 20, 2008. The Indictment alleges conduct in furtherance of the obstruction of justice conspiracy (Count Seven) at least as late as August 22, 2003—four years, eleven months and 29 days prior to the filing of the Indictment. In regard to the substantive obstruction of justice charge (Counts 8) and the money laundering charge (Count 9), the Indictment alleges conduct in furtherance of those charges as late as September 2003 and December 2003, respectively. Thus, Counts 7, 8 and 9 were "found" within the applicable limitations period.

Cherico's motion to dismiss Counts 7, 8 and 9 on statute of limitation grounds is denied.

*Post–Indictment Delay and Cherico's Sixth Amendment Right to a Speedy Trial*

■ Cherico moves for dismissal of the entire indictment, arguing that delays since the return of the Indictment violate his Sixth Amendment right to a speedy trial.

The Supreme Court has established a two-tiered inquiry for evaluating a defendant's claim that he was deprived of his Sixth Amendment right to a speedy trial. First, in order to trigger a Sixth Amendment analysis, the period between accusation and trial must cross the threshold dividing "ordinary" from "presumptively prejudicial" delay since, "by definition, [a defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett v. United States,* 505 U.S. 647, 651–52, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). There is no set definition of "presumptively prejudicial," and, "the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In other words, " . . . the delay

that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.*

If, in light of the nature and complexity of the case, the delay between accusation and trial is uncustomarily long, then and only then does the court analyze other factors in determining whether the delay was so great, inexcusable, and prejudicial as to infringe the Sixth Amendment. *United States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992). If the court reaches this second step in the analysis, four factors "must be considered in determining whether a defendant's sixth amendment right to a speedy trial has been violated: (i) the length of the delay, (ii) the reason for the delay, (iii) whether and how the defendant has asserted his speedy trial rights, (iv) resultant prejudice, if any." *Garcia Montalvo v. United States,* 862 F.2d 425, 426 (2d Cir.1988) (per curiam) (citing *Barker,* 407 U.S. at 530–32, 92 S.Ct. 2182). "No one of these factors, however, is 'either a necessary or sufficient condition to the finding of a deprivation of a right,' and courts still must engage in a sensitive balancing process whereby the conduct of *both* the prosecution and the defendant are weighed." *Rayborn v. Scully,* 858 F.2d 84, 89 (2d Cir.1988) (emphasis in original) (quoting *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). Applying these standards, the Supreme Court has upheld pretrial delays "well over five years," *Barker,* 407 U.S. at 533, 92 S.Ct. 2182, and the Second Circuit has upheld delays of up to 58 months. *United States v. Lane,* 561 F.2d 1075, 1078 (2d Cir.1977).

The Second Circuit has held that where an indictment was "properly" sealed, the length of delay for purposes of the Sixth Amendment is measured from the date when the indictment is unsealed. *Watson,* 599 F.2d at 1156. I recognize that my colleague, The Hon. Shira A. Scheindlin, has held that the Sixth Amendment delay must be measured from the date the indictment was filed, even if it was sealed. *See United States v. Leaver,* 358 F.Supp.2d 255, 269 (S.D.N.Y.2004). Judge Scheindlin concluded that the holding in *Watson* had been called into doubt both by the practice in this circuit and by the Supreme Court's decision in Doggett, *see Leaver,* 358 F.Supp.2d at 267.

The notion that *Doggett* overruled the holding in *Watson* is, as far as I can tell, simply wrong. In *Doggett* the indictment was never sealed. Rather, the defendant fled to Colombia shortly after he was indicted on federal drug charges. After a brief period of incarceration in Panama, he was released to Colombia; he returned to the United States about 30 months after the indictment was handed down, where he lived openly, under his own name, in the Commonwealth of Virginia for six years before the government found and arrested him. The Supreme Court agreed with the district court that the government had not been sufficiently diligent in seeking to locate Doggett, noting, "[F]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes." 505 U.S. at 652–53, 112 S.Ct. 2686. Doggett says nothing at all about delay attributable to the proper sealing of an indictment.

Furthermore, I do not read either *United States v. Koskotas,* 888 F.2d 254 (2d Cir.1989) or *Rayborn v. Scully,* 858 F.2d 84 (2d Cir.1988)—the Second Circuit cases that purportedly establish a practice inconsistent with *Watson, see Leaver,* 358 F.Supp.2d at 267 nn. 97 & 98—as doing any such thing. In fact, in neither case did the court go beyond the first step of the two-step *Doggett* inquiry, so it never addressed whether a delay was presumptively prejudicial under *Barker.*

The Second Circuit has never expressly overruled or even criticized *Watson*, it thus remains controlling precedent and so binds this court. *See Jackson v. Good Shepherd Svcs.*, 683 F.Supp.2d 290, 292 (S.D.N.Y.2009).

Measuring the length of delay here from the point when the properly sealed indictment was unsealed, the delay has not been "uncustomarily long," *see Vassell*, 970 F.2d at 1164. The Cherico Indictment was unsealed 12 months ago. Under the "particular circumstances of this case," *Barker*, at 530, 92 S.Ct. 2182—which include the facts that (1) the allegations in the indictment are complex, (2) the evidence includes thousands of pages of documents, and (3) the defendant has repeatedly consented (or at least failed to object) to the exclusion of time under the statutory Speedy Trial Act, a delay of now twelve months is not presumptively prejudicial. Cherico has not shown that the case thus far is moving forward with anything other than "customary promptness." *Doggett*, 505 U.S. at 652, 112 S.Ct. 2686. Therefore, I need never reach the second step of the two-step analysis; the motion to dismiss the indictment on constitutional speedy trial grounds must be denied.

 Assuming for sake of argument, that *Watson* does not preclude me from reaching the second tier of the *Barker* analysis in a case where *actual* prejudice is raised in a more than perfunctory way, Cherico argues that he was actually prejudiced by the delay that resulted from the improper sealing of the Indictment. He identifies as prejudicial the fact that one witness (Daniel Forbes) has died and another (Philip Eitman) has moved to Costa Rica and cannot be subpoenaed to testify at trial. However, Cherico does not demonstrate prejudice, because it does not appear that either witness can give testimony that exonerates him.

Forbes is indeed dead, but on the record before me, the only party prejudiced by that unhappy mischance is the Government. The Government has established to the satisfaction of this Court that Forbes was the first person to inculpate Cherico in the mortgage fraud scheme, and that at the time of his death, Forbes was preparing to enter into a cooperation agreement that would have required him to testify at Cherico's trial, where was would have been a key Government witness. (Govt. Memo at 29). Cherico has not identified any testimony Forbes might have given that would have helped his cause; the actual facts suggest that, for Cherico, Forbes' death was a fortuity.

Cherico suggests that Eitman, who arranged loans for properties in the case, could have "certif[ied]" that Cherico was no more than a real estate lawyer who represented certain purchasers and sellers in high-end transaction. However, the Government's position is that Hitman's proposed testimony is entirely consistent with its theory of the case. The Government expects the documentary evidence presented at trial—which includes proof of transactions where defendant represented both the buyer and the seller on the same real estate transaction—to show that Cherico abused his position as an attorney to commit the charged crimes. That conduct cannot be explained away by a witness who would testify that Cherico served as a real estate attorney on the challenged deals, a point the Government not only concedes but intends to prove.

Therefore, Cherico has not shown any actual prejudice from the unavailability of either witness.[1]

---

1. Cherico has raised no issue under any of the other three *Barker* factors. As to the first two *Barker* factors: Cherico's claim that the 31 month "delay" between the return of the Indictment and today is too long is simply a

Cherico's motion to dismiss the indictment on constitutional speedy trial ground is denied.

### Confidential Witness's Post Indictment Communications with Cherico

In the final section of his reply brief, Cherico raises for the first time the charge that the Government acted improperly by allowing the confidential witness to have conversations with defendant after the Indictment was filed and sealed:

> The fact that this indictment was sealed in order to conceal the CW's identity enhanced the likelihood that a violation of Louis Cherico's Sixth Amendment Rights would occur. We reiterate—there was no valid reason for the government to use its CW in this case and the fact that it has done so has resulted in impermissible prejudice to Louis E. Cherico including and intrusion into his conversations after his right to counsel had arisen and his actual retention of counsel had occurred.

(Cherico Reply at 4–5). It is not clear whether Cherico is seeking to suppress any statements he made to the confidential witness after the filing of the Indictment, or whether he is simply arguing the point as further evidence that defendant was prejudiced by what he believes to be the "improper" sealing of the Indictment. Either way, his contention that the Government did something wrong lacks merit.

A defendant's Sixth Amendment right to counsel is violated when a private individual, acting as a Government agent, deliberately elicits incriminating statements from an indicted defendant without the presence of the defendant's counsel. *Massiah v. United States*, 377 U.S. 201, 206–207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Whitten*, 610 F.3d 168, 193 (2d Cir.2010) (per curiam). However, the Sixth Amendment is not violated when "whenever—by luck of happenstance—the [Government] obtains incriminating statements from the accused after the right to counsel has attached." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (internal citations omitted). "Information is only excluded if it is obtained as a result of the Government's intentional efforts." *Whitten*, 610 F.3d at 193. "In order to require a hearing on such a claim, assuming the Government has not interfered with the attorney-client relationship deliberately, the defendant bears the burden of alleging specific facts that indicate communication of privileged information to the prosecutor and prejudice therefrom." *United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir.1995).

back-door attack on the Government's *bona fides* in securing the sealing of the indictment. This court has already ruled that the Government had compelling reasons to seal the indictment and that it did not keep the indictment sealed for an overly long period of time. Defendant cannot get around that ruling by relying on *Barker*. Cherico's contention that the length of time between when the alleged crime occurred and the indictment was returned weighs in favor of his speedy trial claim is unavailing, because no charge that is brought within the applicable statute of limitations (as all charges here were) violates a defendant's speedy trial rights.

To the extent that Cherico is arguing that the delay from the time when the indictment was unsealed until now violates his constitutional right to a speedy trial, his argument has no merit, because defendant did not assert his speedy trial rights until he made this motion on October 22, 2010—a strategic litigation choice that he (and his counsel) made. Cherico either affirmatively consented to or did not object to the exclusion of time under the Speedy Trial Act on multiple occasions. Inasmuch as the Government provided extensive documentary discovery to the defense, which required several months for review, Cherico's assent to the exclusion of time is perfectly understandable. But he cannot now go back on his failure to object to the exclusion of time.

Cherico has failed to allege any specific facts about statements he made to the CW that suggest they were obtained in violation of his Sixth Amendment right to counsel. He fails to demonstrate that any attorney-client privileged information was communicated to the prosecutor by the CW. His broad allegation is insufficient to support a *Massiah* claim, or even to warrant a hearing on the issue.

### Conclusion

Cherico's motion is denied in all respects. The trial of this matter will commence on the first available date on the Court's trial calendar: Monday, April 25, 2011.

This constitutes the decision and order of the court.